IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:08-cr-20280-SHM-cge |
| | ) | |
| v. | ) | |
| | ) | |
| MARIO HAMPTON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court are the September 22, 2010 Motion to Suppress ("Motion to Suppress") and the September 2, 2011 Objections to the Magistrate's Report and Recommendation on the Defendant's Motion to Suppress filed by Defendant Mario Hampton ("Defendant"). (Mot. to Suppress Statement, ECF No. 74; Def.'s Objections, ECF No. 119) ("Objection").) Magistrate Judge Charmiane Claxon recommended that the Court deny Hampton's Motion to Suppress. (Report and Recommendation on Def.'s Mot. to Suppress, ECF No. 114 ("Report").) Having reviewed Hampton's objections, this Court OVERRULES them and ADOPTS the Report of the Magistrate Judge. The Motion to Suppress is DENIED.

## I.    Procedural and Factual Background

At approximately 11:00 p.m. on July 31, 2008, officers with the Memphis Police Department ("MPD") Organized Crime Unit went to the Hillview Apartments in Memphis, Tennessee, to investigate numerous complaints of drug activity from residents of the apartment complex.[1] (Report 1-2.)  Officer Trantham, Detective Graves, and Detective Haley entered the complex in an unmarked vehicle and approached a large group that had congregated in the middle of the complex.  (Id. at 2.)  Simultaneously, Officer Keith Crosby, Detective Star Handley, and Officer Jay Robinson entered the complex in an unmarked vehicle and observed what they believed to be a narcotics transaction involving a "couple of hand-to-hand exchanges." (Id.)  The officers "calmly" exited the vehicle wearing "OCU police vests" with "police" written across their chests and firearms in plain view.  (Id.)  They identified themselves as police officers and approached the perpetrators of the suspected narcotics transaction.  (Id.)

Before the officers had initiated a conversation, two of the suspected perpetrators discharged their firearms, and Officer Grays returned fire.[2] (Id.)  During a second exchange of

---

[1] All facts are taken from the Magistrate Judge's Report.  Except where noted, Defendant has not objected to the proposed factual findings.  (See Objection.)
[2] Here, the Magistrate Judge noted that the identity of "Officer Grays" is ambiguous from the record.  (Report 2 n.4.)  Officer Grays is not to be confused with Detective Graves, as the Detective was not part of the group that exchanged volleys in connection with the narcotics transaction.  (Id.)

shots, and from a distance of approximately 75 feet, Officer
Crosby saw the "flash from a gun" and observed a man in a black
t-shirt run around a corner. (Id. at 2-3.) Officers were
unable to detain the man wearing the black t-shirt or the second
shooter. (Id.)

After hearing gunshots, Officer Trantham, Detective Graves,
and Detective Haley abandoned their interviews in the middle of
the complex and approached the scene of the firearm exchange.
(Id.) An extensive investigation followed, as officers searched
for the two unidentified gunmen and administratively inquired
into the conduct of the officers who returned fire.[3] (Id.)
During the investigation, Officer Crosby followed the suspected
path of the unidentified gunman in the black t-shirt, and the
officer found a .45 caliber firearm and a "large bag containing
marijuana" in the shrubbery near the suspect's escape route.
(Id.)

After assigning an officer to watch the contraband and the
firearm, Officer Crosby continued searching the area for the
suspect. (Id.) Crosby noticed a male in a "fresh," unwrinkled
red shirt with "mud around his ankles" who was sitting on the

_____

As Magistrate Judge Claxon noted, the identity of the officer who returned
fire is not at issue in the instant Motion.
[3] In situations involving returned fire, MPD protocol requires that
supervisory officers, a security squad, a shoot team, and "other personnel"
be notified and respond. (See Report 3.) While the investigation is
occurring, all officers involved must remain on the scene until notified that
the investigation is complete. (Id.)

steps of the apartment building and initiated a conversation, asking the man "general questions," such as whether he knew of anyone who would shoot at police officers. (Id.) Officer Crosby had no reason to be suspicious of this man, who would later by identified as the Defendant, and the officer "didn't pay too much attention" to his clean shirt and muddied legs. (Id. at 4.)

The Defendant was initially hesitant to respond to Officer Crosby's questions. (Id.) However, the Defendant later said he suspected who might have shot at police, and Officer Crosby advised Defendant that he might be able to become an informant if he had such information. (Id.) The Defendant appeared interested in becoming an informant, and he said that he "knew about guys with guns and dope." (Id.) The Defendant then led Officer Crosby around the apartment complex, identifying locations that certain individuals who might be responsible for the incident frequented. (Id.) During this time, Defendant frequently inquired about what Officer Crosby had located in the bushes. (Id.)

Officer Crosby and the Defendant spent approximately thirty-five to forty minutes surveying the apartment complex before returning to the area where Officer Crosby had first encountered the Defendant. (Id.) Officer Crosby then relieved the officer who had watched the evidence, but planned to stay in

the immediate vicinity because he was waiting for crime scene personnel to finish their investigation. (Id.) The Defendant was not a suspect at the time. (Id.)

While standing near the apartment complex, the Defendant asked to use Officer Crosby's cell phone on approximately three separate occasions. (Id.) The Defendant made two calls in Officer Crosby's presence, but began walking away from the officer during the third call. (Id.) Officer Crosby ordered the Defendant to stop, but he continued to walk away with Officer Crosby's phone. (Id.) The officer initially followed the Defendant around the corner of the building until the evidence was nearly outside his field of vision, but Officer Crosby noticed a female on a cell phone approaching to within six to eight feet of the evidence. (Id. at 4-5). Officer Crosby suspected that the woman was cooperating with the Defendant, but he could not be certain. (Id.) The female "ducked and ran back around the building" when she saw Officer Crosby, apparently ending her search. (Id.) Officer Crosby later came to believe that the woman was the Defendant's girlfriend. (Id.)

Because Officer Crosby suspected that the Defendant had attempted to lure him away from the evidence, the officer ordered the Defendant to return his cell phone and sit on the ground. (Id.) Shortly thereafter, officers were advised that a

female in the vicinity had "flagged down" officers to report that the suspected gunman was a "black male with a light complexion, freckles, . . . [and] a red shirt . . ." and that he was currently speaking with police. (Id.) Because this description was "exactly consistent" with the Defendant's appearance, Officer Crosby immediately detained the Defendant. (Id.)

At approximately 1:30 a.m. on August 1, 2008, the Defendant was placed under arrest and put into Officer James McDonald's marked squad car. (Id.) Officer McDonald remained outside the car along with one or two other officers, while Officer Crosby learned that Defendant had previously been banned from the property. (Id.) Neither Officer Crosby nor Officer McDonald interviewed Defendant after he was detained, and they did not observe any other officers interview Defendant during this time. (Id. at 5-6.)

At approximately 3:30 a.m.,[4] Officer McDonald transported Defendant to the Felony Response Office at 201 Poplar. (Id. at 6.) Defendant arrived at the Felony Response Office at approximately 3:45 a.m. (Id.) Because the investigation was ongoing and witness interviews were in progress, Sergeant

---

[4] The investigation of the crime scene concluded at this time. (See Report 6.)

Stanley Johnson placed the Defendant on a forty-eight hour hold at 6:41 a.m. The hold began at 2:00 a.m. (Id.)

Defendant was temporarily held at the Felony Response Office when he first arrived. (Id.) Although Sergeant Johnson was responsible for interviewing the Defendant if an interview were necessary, Sergeant Johnson did not interview Defendant or observe any other officers interview him. (Id.) Defendant left Sergeant Johnson's office at 6:41 a.m. to be booked into jail for the remainder of his forty-eight hour hold. (Id.) He was booked at approximately 7:00 a.m. (Id.) Defendant remained in the jail until approximately 2:00 p.m. (Id.)

Sergeant Steven Roach of MPD's Felony Assault Unit was assigned to investigate Defendant's role in the crimes. (Id.) At approximately 2:00 p.m. on August 1, 2008, Sergeant Roach and Detective Wilky transferred Defendant to interview rooms in the homicide unit, and they provided Defendant with a meal. (Id. at 6-7.) At approximately 3:00 p.m., Segeant Roach and Detective Shafer advised the Defendant of his rights. Before initiating questioning, officers asked Defendant to read the Advice of Rights form aloud, and the Defendant complied. (Id. at 7.) Defendant was then asked to execute the written Advice of Rights form, and he provided his name, date of birth, Social Security number, and level of education. (Id.) Defendant demonstrated his ability to read and write without eyeglasses. (Id.)

The Advice of Rights form asked whether Defendant "under[stood] the rights that have been explained to him," and Defendant responded affirmatively and initialed his response. (Id.) Sergeant Roach testified that Defendant never mentioned drug or alcohol consumption during the advice-of-rights process. (Id.)[5] Defendant signed the Advice of Rights form at approximately 3:05 p.m. in the presence of Sergeant Roach. (Id.)[6]

At the conclusion of the advice-of-rights process, Sergeant Roach delegated Defendant's interview to Officer Chatman and Detective Evans. (Id. at 7-8.) After several hours of questioning, Defendant executed his first signed statement at approximately 6:00 p.m. with a stenographer present. Before obtaining Defendant's signed statement, officers advised him of his rights as follows:

> We are going to ask you some questions regarding the above complaint. You have the right to remain silent and anything you say can or will be used against you in a court of law. You have the right to have a lawyer, either of your own choice, or court appointed if you are unable to afford one, and to talk with your lawyer before answering any questions, and to have your lawyer with you during questioning if you wish.

---

[5] Defendant objects to the Magistrate Judge's findings crediting Sergeant Roach's testimony over Defendant's on the issue of intoxication. (See Objection 2.) Defendant claims to have ingested large amounts of alcohol in the hours leading up to his arrest and that he was still intoxicated when officers questioned him. See infra Section III.A.I.

[6] Defendant maintains that the waiver was not made knowingly, arguing that "[a]lthough waiver forms were signed, Defendant testified that he ha[d] experience with the system and had asked for an attorney." See Objections 2; see infra Section III.A.II.

(Id.)  Defendant  again  acknowledged  his  understanding  of  these
rights  and  reiterated  his  wish  to  make  a  statement.  Defendant
affirmed  that  his  statement  was  of  his  own  free  will,  without
threats,  promises,  or  coercion  from  anyone  and  that  he  was  not
"currently  under  the  influence  of  any  intoxicants  or  drugs  that
may  impair"  his  judgment.  (Id.)  After  giving  his  statement,
Defendant  remained  in  the  holding  cell  and  voluntarily  rested  on
the  floor.[7]  (Id.)  He  received  no  instruction  from  Sergeant
Roach,  Officer  Chatman,  or  Detective  Evans  to  rest  on  the  floor.
(Id.)

After  Defendant  had  executed  his  first  written  statement,
officers  compared  it  to  previously  compiled  information  and
noted  discrepancies  and  inconsistencies.  (Id.)  When  officers
determined  that  these  discrepancies  required  additional
questioning,  officers  woke  Defendant  and  continued  his
interview.  (Id.)  During  his  second  interview,  Defendant
acknowledged  that  his  previous  statement  was  inaccurate.  (Id.)
Based  on  this  information,  officers  judged  that  a  second  written
statement  was  needed.  (Id.)  Before  beginning  his  second
written  statement,  Defendant  was  advised  of  his  rights  for  a
third  time  and  acknowledged  that  he  understood  his  rights  and
wished  to  provide  a  statement.  (Id. at 9.)  Defendant  again

---

[7] Defendant objects to the Magistrate Judge's findings that Defendant rested
on the floor, arguing that Defendant was sleep deprived and had no choice but
to lie on the floor because he was handcuffed.  See Objection 2; see also
infra Section III.A.III.

acknowledged that he elected to provide a statement of his own free will without threats, promises, or coercion, and that he was not "currently under the influence of any intoxicants or drugs that may impair" his judgment. (Id.) Defendant executed and signed his statement at approximately 9:00 p.m. (Id.)

In his post-investigation testimony, Defendant claimed that during questioning he had been awake since approximately 10:00 or 11:00 a.m. on July 31, 2008, and that he had consumed "[a]bout a fifth" of cognac, between twelve and twenty-four "long neck" bottled beers, and some bourbon" in the period leading up to his arrest. (Id.) Defendant testified that this alcohol consumption was an ordinary amount. (Id.) Defendant also denied being under the influence of any drugs. (Id.) Defendant claimed that the effects of sleep deprivation and alcohol intake caused him to "nod[] off" and "fall[] asleep" during questioning and that he informed officers about his exhaustion and his intoxication. (Id.)

Despite Defendant's testimony about alcohol consumption, Sergeant Roach, Officer Chatman, and Detective Evans testified that Defendant presented no signs of drug use or drinking, was not falling asleep during questioning, and responded to questions coherently. (Id.) When officers confronted Defendant with evidence of his positive gunshot residue test, Defendant's "composure changed quite a bit" in a way that reflected lucidity

and awareness. (Id. at 9-10.) Officers also questioned Defendant about his intoxication during the advice-of-rights process, and Defendant said he was sober. (Id. at 10.) Although Defendant claims to have informed officers of his fatigue during questioning, Detective Evans testified that Defendant never mentioned being tired and never refused to continue questioning due to sleep deprivation. (Id.) Finally, Sergeant Roach and Officer Chatman testified that individuals being interviewed are offered restroom breaks, "smoke breaks," food, and water every hour and a half. (Id.) Although Defendant's "supplement" does not precisely state whether officers offered Defendant these standard opportunities, Sergeant Roach and Officer Chatman believed that he was offered food, water, and "smoke breaks," and the officers were "absolutely" certain that Defendant was permitted to use the restroom. (Id.)

Defendant also claims that he "almost continuously" requested an attorney from the moment of his detention and throughout the duration of questioning, but that officers refused his invocation of rights because they did not want to wait. (Id.) Sergeant Roach, Officer Chatman, and Detective Evans testified that Defendant never requested an attorney and acknowledged at all times when he was advised of his rights and wished to make a statement without invoking his right to

counsel. (Id.) Defendant also admitted that he had been arrested over twenty-five times, that he had been questioned by police on previous occasions, and that he was "well aware" of his right to an attorney. (Id.)

There is confusion about whether Defendant appeared in court on August 1, 2008, in this case, and more specifically about whether he might have been appointed counsel at any such appearance. The confusion on this point seems to have arisen when Defendant told Sergeant Roach on August 1 that he was tired from going to court earlier that day, which Sergeant Roach did not recall but which was noted in the supplement. (Id. at 11.) Defendant never mentioned why he had gone to court and never stated that an attorney had been appointed for him. (Id.) At the hearing, Defendant testified that he could not remember whether he went to court on August 1, 2008. (Id.) Sergeant Roach testified that he was not aware that Defendant had been taken anywhere other than from his holding cell to the interview rooms, and that, had the Defendant been taken to court or another location, Sergeant Roach would have been notified. (Id.) Detective Evans testified that he reviewed the "JSS System" of the Shelby County courts, which did not list any court appearance for Defendant on August 1, 2008, although Detective Evans said he lacked the official records necessary to ensure total accuracy. (Id.) The Inmate Logbook demonstrates

that Defendant was logged out from the jail from 1:44 p.m. until 9:25 p.m., which is consistent with the time during which Defendant was interviewed.[8]  (Id.)

## II.  Standard of Review

"A district judge must determine <u>de novo</u> any part of a magistrate judge's disposition that has been properly objected to."  Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C).  After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C).  The district court is not required to review—under a <u>de novo</u> or any other standard— those aspects of the report and recommendation to which no objection is made.  <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985). The district court should adopt the findings and rulings of the magistrate judge to which no specific objection is filed.  <u>Id.</u> at 151.

## III. Analysis

### A. Findings of Fact

Defendant objects to the Magistrate Judge's findings that: (1) the officers were credible when they testified that the

---

[8] The Inmate Logbook has two listings for an individual named Mario Hampton. (<u>See</u> Report 11 n.6.)  On review of the log entries for the respective defendants, the Magistrate Judge concluded that the Inmate Logbook "corroborates, albeit with only the slightest weight, the Government's assertion that Defendant was interviewed that afternoon and evening and did not have any morning court appearance."  (<u>Id.</u>)  Regardless of the weight the Magistrate Judge gave this evidence, Defendant did not object to this finding of fact.  Therefore, the Court adopts the finding of the Magistrate Judge. <u>See</u>  <u>Thomas v. Arn</u>, 474 U.S. 140, 151 (1985).

Defendant was not intoxicated or sleep deprived, (2) the Defendant did not request an attorney, and (3) Detectives provided Defendant with breaks from questioning, although the breaks were not noted in "the supplement."[9]

### 1. Intoxication and Sleep Deprivation

Defendant objects to the Magistrate Judge's reliance on the officers' credibility in finding that Defendant, at all times during questioning, appeared sober, lucid, and responsive to interrogation. (Objection 2; see Report 8-10.) According to Defendant, it was never disputed that Defendant went without sleep for over twenty-four hours, and if Defendant were not sleep deprived and not intoxicated, "why was he found asleep upon the floor handcuffed to a chair[?]" (Objection 2.) Sergeant Roach, Officer Chatman, and Detective Evans testified that Defendant did not appear intoxicated or sleep deprived. (See Report 9.)

This Court is both "'statutorily and constitutionally required' to engage in a de novo review" of the credibility of witnesses. United States v. Burchman, 388 F. App'x 478 (6th Cir. 2010) (quoting United States v. Worley, 193 F.3d 380, 383 n.6 (6th Cir. 1999)). On this record, the officers' testimony

---

[9] The record does not define what is meant by the "supplement." A comprehensive review of the record demonstrates that the "supplement" is a notation device used by officers to document and record routine actions during investigations. (See Feb. Hr'g Tr., ECF No. 104, at 112, 114, 122, 128, 151, 152.) Multiple officers relied on their supplements during questioning.

was credible. Each officer provided specific, in-depth testimony demonstrating that Defendant was alert and lucid. According to Sergeant Roach, Defendant "understood everything, even when [officers] showed him the presumptive test that showed . . . what was presumably [gunshot residue] on his hands . . . his composure changed quite a bit." (February Hr'g Tr. at 131, Feb. 28, 2011, ECF No. 104) (Feb. Hr'g Tr.").) Officer Chatman testified that Defendant appeared "calm," his responses were "coherent," and he did not appear intoxicated. (See id. at 138.) Detective Evans testified that Defendant appeared "coherent" and did not exhibit signs of alcohol or drug-induced intoxication. (See id. at 172-73). Detective Evans testified that the Defendant slept in the lull between the first and second statements, when officers had to recall the stenographer. (See id. at 173).

Defendant fails to provide specific examples of lack of credibility, choosing instead to state broadly that the "key issue is the credibility" of the witnesses. (Objection 2.) Absent specific examples, the Court finds no reason to "set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." Peveler v. United States, 269 F.3d 693, 702 (6th Cir. 2001); see also Moss v. Hofbauer, 286 F.3d 851, 868 (6th Cir. 2002). The testimony of the officers supports the

Magistrate Judge's findings. The Court finds that Defendant was neither intoxicated nor sleep deprived, and that the officers' testimony is a credible basis for those determinations.

## 2. Defendant's Requests for an Attorney

Defendant objects to the Magistrate Judge's crediting the officers' testimony over Defendant's testimony about whether he requested an attorney. During the Suppression Hearing, Officer Chatman, Sergeant Roach, and Detective Evans testified that Defendant did not request an attorney. According to Sergeant Roach, at no time did the Defendant request a lawyer or indicate that he had previously requested a lawyer. (See Feb. Hr'g Tr. 108.) The testimonies of Officer Chatman and Detective Evans corroborate Sergeant Roach's account. (See id. at 148-49, 160, 174-75.) Because the testimony of all three detectives aligns seamlessly, a de novo review supports the Magistrate Judge's crediting of that testimony over the Defendant's. The Court finds that the Defendant failed to request an attorney during the questioning.

## 3. Breaks from Questioning

Defendant's final factual objection is that the officers' claim of providing breaks for Defendant is without support because the breaks were not noted in MPD's records. As a preliminary matter, the officers acknowledge that the supplement is incomplete on this issue. (See Feb. Hr'g Tr. 127:11-25). A

closer review of the record, however, demonstrates that officers provided or offered food, restroom breaks, water, and smoke breaks during questioning.  (See id. at 147-48.)  At a minimum, the testimony of Officer Chatman and Sergeant Roach supports this conclusion.  (See id. at 127-28, 147-48, 156.)  Because the record contains "no compelling reason to second-guess the magistrate judge's decision," her credibility determination stands.  United States v. Freeman, 412 F. Appx. 735, 743 (6th Cir. 2010).

### B.  Conclusions of Law

Defendant objects to the conclusion that his waiver was knowing and voluntary, contending that, under Murphy v. Ohio, 551 F.3d 485 (6th Cir. 2009), there was extensive deprivation of sleep and physical punishment because he was handcuffed to a chair and could only sleep on the floor.[10]  By failing to raise other objections, the Defendant has waived additional challenges to the Magistrate Judge's conclusions of law.  See Thomas, 474 U.S. at 151 (finding that the district court should adopt the findings and rulings of the magistrate judge to which "no specific objection is filed.") (emphasis added).

---

[10] The Court understands Defendant to be raising one objection to the Magistrate Judge's conclusions of law.  Although Defendant submits that "there was a prolonged detention for purposes of interrogation," the Court interprets this sentence to contain a single objection that is modified in the following sentence, where the Defendant cites Murphy.  (See Def.'s Objections 2.)  The Court bases this interpretation on the connection Defendant makes between "prolonged detention" and "sleep deprivation and intoxication."  (Id.)

The Magistrate Judge concluded that Defendant's waiver of rights was knowing and voluntary and that the record does not support Defendant's contention that he was too exhausted or intoxicated to make a valid waiver. (Report 15.) Defendant seeks to suppress "any and all" statements he made on or around August 1, 2008.

The Fifth Amendment privilege against self-incrimination is implicated whenever "an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda v. Arizona, 384 U.S. 436, 478 (1966). Although Miranda establishes that suspects must be apprised of certain rights to protect against self-incrimination, a suspect may waive his Miranda rights "provided the waiver is made voluntarily, knowingly, and intelligently." Id. at 444. There are two "distinct dimensions" to valid waivers of Miranda rights. Moran v. Burbine, 475 U.S. 412, 421 (1986). First, waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. (quoting Fare v. Michael C., 442 U.S. 707, 725 (1979)). Second, "the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Id. In all cases, the government must establish that "the totality of the

circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension" before the Court may conclude that Defendant's <u>Miranda</u> rights have been waived. <u>Id.</u>

The Magistrate Judge noted, and the Court agrees, that the Defendant has not challenged the voluntariness of his statement. (Report 15). Therefore, the Court will focus on whether Defendant's waiver was knowingly and intelligently made. The issue is not whether the "criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege," but whether the "suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." <u>Colorado v. Spring</u>, 479 U.S. 564, 574 (1987).

"Evidence that a defendant suffered, at the relevant time, from a condition or deficiency that impaired his cognitive or volitional capacity" is never, standing alone, sufficient to conclude that a confession is involuntary or a waiver is unknowing; "some element of police coercion is always necessary." <u>United States v. Newman</u>, 889 F.2d 88, 94 (6th Cir. 1989); <u>see also</u> <u>United States v. Dunn</u>, 269 F. App'x 567, 573 (6th Cir. 2008) (finding that a suspect's waiver of <u>Miranda</u> rights was knowing and intelligent because he was "alert, coherent, and lucid" during questioning, despite being under the

influence of Vicodin and Marijuana at the time of his arrest);
United States v. Treadwell, 11 F. App'x 502, 511 (6th Cir. 2001)
(holding that a defendant's consumption of "an intoxicating
medication in a dose more than five times that prescribed by
state physicians" did not render confession involuntary); Marcum
v. Knight, No. 89-6192, 1991 U.S. App. LEXIS 355, at *1 (6th
Cir. Jan. 8, 1991) (finding waiver sufficient where defendant
had been "drinking heavily" and had a blood alcohol level of .25
percent); Wernert v. Arn, 819 F.2d 613, 616 (6th Cir. 1987)
(upholding the admission of a confession although the defendant
claimed that her drug and alcohol ingestion the day before and
her lack of food and sleep prohibited her from voluntarily
waiving her rights).

Defendant signed three separate Miranda waivers during
police questioning. The Defendant affirmed his knowledge of the
rights being waived and executed each document. Each waiver
specifically asked Defendant whether he was under the influence
of alcohol or drugs, and he responded negatively. There was no
coercion, intimidation, or police misconduct. Therefore, the
Court finds that, under the totality of the circumstances,
Defendant's waiver of Miranda rights was valid.

The Defendant's claim of sleep deprivation and exhaustion
is not supported by the facts or the law. Defendant was "quick
responding [to] questions" and did not appear to be under the

influence of any mind-altering substances during questioning. See Dunn, 269 F. App'x at 573. In Dunn, the Sixth Circuit concluded that even a potent mixture of mind-altering substances did not contribute to "a lack of comprehension" that sabotaged the Defendant's ability to "make any important decisions." Id. The Defendant's claim that intoxication and sleep deprivation undermined his knowing waiver is not well-taken.

Defendant's reliance on Murphy v. Ohio, 551 F.3d 485 (6th Cir. 2009), is misplaced. (See Objection 2.) In Murphy, the Sixth Circuit rejected a defendant's argument that "low intelligence" precluded a knowing and intelligent waiver. See Murphy, 551 F.3d at 514. Before making each statement, police advised Murphy of Miranda, and Murphy subsequently acknowledged and waived his rights. Id. The Sixth Circuit concluded that "when a suspect suffers from some mental incapacity, such as intoxication or retardation, and the intoxication or retardation is known to interrogating officers, a 'lesser quantum of coercion' is necessary." Id. (quoting United States v. Sablotny, 21 F.3d 747, 751 (7th Cir. 1994)). Murphy was familiar with the justice system because of his prior record, and police officers testified that he understood the rights that were being waived. Id.

Despite Defendant's argument, no facts in Murphy suggest that the defendant there was subjected to "extensive deprivation

of sleep and physical punishment by leaving the Defendant cuffed to a chair only to be able to sleep on the floor." (Objection 2.) In fact, Murphy undermines Defendant's arguments. Because Defendant exhibited no outward signs of intoxication or mental defect, and because officers explained the Miranda waiver before each signature, Murphy argues that Defendant's position should be rejected. See Murphy, 551 F.3d at 514.

**IV. Conclusion**

Based on the foregoing, the Defendant's objections are OVERRULED. The Magistrate Judge's Report and Recommendation is ADOPTED, and the Defendant's Motion to Suppress Evidence and Statements is DENIED.

So ordered this 28th day of October, 2011.

s/ Samuel H. Mays, Jr._____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE